May it please the Court, Armin Skolmowsky for Petitioner Montolalu. As a threshold matter, Your Honors, this is a pre-Real Idea case. I think with this case we must keep this case in perspective. If you want to compare, in this country we had a church bombing 50 years ago in Birmingham, and to this day we still talk about it. In this case, Mr. Montolalu's case, in one time period, 2003, there were 25 churches destroyed. 2005, churches attacked by Muslim mobs. 2004, in the capital, Jakarta, mobs attacked four churches, attacked the pastor, destroyed the churches. But the country reports suggest a decrease in violence since November of 2001. And if I'm to give substantial evidence, review, to what the BIA did, when I've got that right out there that the country reports suggest a decrease, how can I say they have no substantial evidence upon which to make their determination? Well, I don't think the BIA mentions a decrease in the sense that it didn't affect the country. Well, if you look at the country reports, there's no question there was a decrease. Well, I would say that the decrease would not affect the petitioner, because if it decreases from 25 churches being destroyed to 24 or 23, it's still Christian churches being destroyed on a regular basis in this country. And that's, I think, the perspective with this case, because I think this case is a big credibility case also. I agree. But it really doesn't have anything to do, the credibility stuff, with the asylum, right? Because, as I understand it, they really didn't go on credibility on the asylum. It was on the withholding. Well, the judge found that there was a one-year problem in this case. Yeah. And the BIA affirmed that. You know, we would disagree with that finding. Well, I appreciate your disagree. That's why on that particular finding I've got to say there's no substantial evidence to support what the BIA did. And I'm looking through the record, and I say, change circumstances mean they change? Well, what changed? The BIA says nothing's changed since 2001. So what in the record compels the different conclusions? So then I go, the country reports say there's been a decrease since November 2001. So I'm having another tough time. I mean, I'd love to say it isn't so, but I'm ‑‑ I mean, if I were the judge, I might be saying different, but I can't be the judge. I have to find if there's substantial evidence here. Well, in this situation, I understand sometimes with motions to reopen, it's the country conditions that change. But in this situation, there can also be personal circumstances that change. And Respondent did testify that when he first came to the United States, they asked him, why didn't you apply for asylum within the one year? And he said, well, you know, I was hoping that things would get better. You know, this and this might happen. I wanted to wait. And then what he talks about is that he contacts the wife. The wife tells him that she's being sexually harassed. She's being ‑‑ the Muslims are looking for him. And then specifically they said, according to my wife, those Muslims people say they will kill me. So that ‑‑ at that point, and he even says that in a statement in the record, you know, the record on page 420 is, I talked to my wife. She told me that she was harassed many times and was often asked about my whereabouts. This is where it becomes personal. They say, you know, the Muslims are telling the wife, we want to find a petitioner. We want to kill a petitioner. Once again, I mean, this is within the immigration court asylum process. There can still be a change, circumstances based on personal changes, as opposed to like a motion to reopen where it's got to be country conditions that change. And this is where he says, that's why I decided to apply for asylum. When he discovers that, he will be killed. He also suggests that the NSEERS went into effect. Right, Judge. I believe there's been some cases that have come out subsequent to this brief, and I would say that probably we would withdraw that argument. That it's not a change of law. I mean, I think that's been pretty much agreed upon since this brief. But we would rest on the change of personal circumstances, you know, where he feels personally targeted by the Muslims. Maybe you could change, unless there are other questions on that particular issue, to the credibility. Right. And that's why I was saying in the start that let's keep this case in perspective. You know, I will agree this was not stellar testimony. He was all over the place. And, however, he- Counsel, do you think that translation issue, a language barrier, may have been the reason why there was so much inconsistencies? You know, in immigration court, there's always about two or three of the same people that show up every time for these hearings, translators. And everybody knows them. The judges know them. The counsels know them. And nobody wants to say anything if something goes wrong. I would say that if you just read this, you can tell that at least the verbal playback was very chopped up English. I'm not sure who this was. It doesn't mention the interpreter. However, you know, I don't know if that was an issue. It was never raised in the hearing or otherwise. It's hard to prove that after the fact. But I would say that what's more of an issue here is what I would say is nervousness. I understand there's cases where, you know, people testify and they say, well, I was nervous. And this court has often said, well, you know, tough luck. Or, you know, that doesn't sound right. But this guy, from the beginning, you see from start to finish, something's off on this whole case. I mean, he doesn't understand the question. He has to have it repeated. You know, he's nonresponsive. You know, you can tell. He says, I'm nervous, I'm nervous, I'm really nervous. And he mentions that throughout the case, beginning and the end. Well, and to help you, you know, the government may argue about the dates. But we've got a lot of law about dates. And dates are not that important in trying to determine credibility. So I didn't focus on dates. I mean, that's to help your client. I really didn't. But the one worry that I have here about the credibility is whose house was attacked. Because it seems to me that that goes to the heart of the matter. It seems to me that he was confronted. It seems to me the BIA rejected the explanation that it was nervousness. I mean, the only reason I brought it up now is you're talking about nervous. They rejected the nervousness and said, you know, you should have been able to provide a consistent and coherent account of those matters at least. And so, therefore, again, on the standard of review, how do I get around that? Well, I think, you know, as we – okay, with that issue in mind, I think that – he just explains, well, why didn't you mention, you know, your house being attacked? Because he mentions – I'm sorry, the statement mentions the pastor's house. And I think he talks about his house. And then they said, well, why didn't you mention the pastor's house? He goes, well, you know, I was nervous. And they said, why didn't you mention your house in the statement? He goes, well, I thought that I could discuss that later. But he does talk about an attack on his house in 1999 where they throw the rocks in the window. And he says – and even the judge goes, well, I thought you mentioned it was destroyed. He goes, no, well, I mentioned it was – the windows were broken. That's the whole thing about the one child, two children incident. That's talked about in 1999. And if you look at the statement, it says in 1999 when Megawati won the election, the Muslims from the neighboring village were outraged. They attacked our village and severely damaged our church and many residences. He didn't say my residence, but there were the residences in his village. I think that what he's talking about is a 1999 incident, which he brings up in the testimony. I'm trying to find the – okay, his house was attacked. I think it's found on the record page 144. Okay, sir, please tell us exactly when you were – sorry – where you were when your house was attacked in December 1999. So, you know, that's where it's a little bit unclear. It wasn't followed up, you know, why he said 1999 here and later on 2000. I think that the attorney or the trial attorney almost suggested the 2000 timeframe, and he almost, like, plays along with it. You know, I just think that this individual – I mean, like I said, from start to finish, he tells his story. It's just you've got to really dig through it. But he tells his story. I think the worst incident was in 2001, New Year's Eve, New Year's Day, and then three weeks later. That was the heart of the matter. I think he consistently talks about that incident. I mean, first he says, well, you know, it was Christmas Day, and now it was New Year's Day. And then I think even at one point he said 2001, and he said, well, sir, you were here in 2001. Oh, I apologize, 2000. So, I mean, you know, you can see that this is not someone that knew everything, like where he lived and everything. And all of a sudden when something bad happens, he doesn't know what he's talking about. He's kind of confused, a little bit confused the whole time. And I think that should be taken into consideration. We've heard your argument, and you went over. But I'll probably give you another minute afterwards, because we really didn't get to the disfavored group analysis. Okay. Good morning again. The record doesn't compel the conclusion that Petitioner established the changed circumstances to excuse his untimely asylum application. You know, it's, I guess, a welcome surprise that he's withdrawing the argument, which was the basis of his argument before the board, that it was the registration of the National Security Exit Registration System that's what triggered his, you know, changed circumstances. So I don't see how he has argued before the agency or before this court that would compel the conclusion differently, that he failed to timely apply for asylum and that he failed to establish those changed circumstances. With regards to the adverse credibility determination with his withholding or removal, again, the record doesn't compel the conclusion that he testified credibly. The agency found that Petitioner's had contradictory dates, testimonies, events, inability to remember when events occurred, and it basically rendered his testimony virtually incoherent. Similar to what this Court held in Riviera. I'm sorry, Your Honor. Oh, I didn't. Okay. Similar to what this Court held in Riviera, that, I mean, he gave repeated inconsistent testimony with regards to details that were very crucial to his claim. And these inconsistencies, particularly when you view them cumulatively, sort of it deprives his claim of the requisite ring of truth in this case. Do you really believe that Riviera suggests that the cumulative effect of inconsistencies and incoherent testimony could support the adverse credibility determination without a particular adverse credibility determination? I mean, I read Riviera pretty carefully. I don't think they're saying that the I.J. from now on can just say, well, it was just a cumulative effect of inconsistencies and incoherent testimony that will give me the basis. It seems to me that what Riviera is saying, you can throw that in at the end if you want, but you've got to come up with some fact of inconsistency here. That's correct, Your Honor. And that's what I was trying to do. The premise for Riviera is the fact of, if you're looking at it, because it's a pre-real ID case, one of the arguments that the holdings of the court made was about this whole ring of truth claim. And the fact of the matter, this court in Lee v. Ashcroft and in Wang said, you just need one, you need one substantial. And there is one. There's the issue of the pastor's home and his home in Christmas Day 2000. You know, he can say it's nervousness or that his counsel didn't prompt him, but he had a reasonable opportunity to explain the perceived inconsistencies. And the transcript, you know, has numerous times where his own counsel prompted him to explain the inconsistencies and he failed to do so. What about, and I guess I'm jumping a little bit ahead, why shouldn't I remand this to the BIA to apply the disfavored group analysis? Well, Your Honor, the reason why it doesn't need to be remanded is the fact that The BIA never undertook the analysis, correct? Right. That there was no need to. And this particular, that's why it's so important to understand the adverse credibility. When this court Well, it seems to me that Tambulon, Tambu, Tam-pu-bo-lon would require us to remand. Well, looking at the string of cases this court has talked about disfavored group, in Wackery in particular it talked about the analysis of disfavored group doesn't alter the quantitative standard of proof, meaning it rather determines the sort of evidence but it doesn't sort of talk about the quantitative. Because of the matter that he was determined to be not credible, it's as if he presented no evidence of an individualized risk, because none of his testimony was credited. So it's as if nothing was presented. And he has to show the individualized risk. It's not enough to show you're a member of a disfavored group. You have to submit some evidence of your individualized risk. Again, in Wackery, this court said, the applicant must still show that his chance of a future persecution is greater than 50 percent. Evidence of group discrimination will go part of the way, which is what Tam-pu-lon would argue. Tam-pu-bo-lon. Right. I'm glad you had trouble with that, too. Right. I have trouble with a lot of these cases. But the court continues to say, but some evidence of individualized risk is necessary for the petitioner to succeed. Because his testimony was deemed to be incredible, he presented no evidence. So that's why it's not necessary for this to be remanded for that type of analysis, because you have incredible testimony, so there's no testimony to establish his individualized risk. So even though the disfavored group analysis is that the BIA must weigh the risk level of the group, vis-a-vis the risk level of the individual, one at least has to show some individual risk to even do that. Right. That's your argument? Right. And that's what the court has established in this line of cases, Wackery and Sale and then finally Tam-pu-lon. When you have a group that is being persecuted, the scale does tip a little bit lower, but there's still that burden of proof nonetheless. And because it's – I'm sorry. Go ahead, Your Honor. I mean, I was thinking, doesn't the I.J.'s ruling suggest that at least some of the events did occur, even though the I.J. did make that adverse credibility finding? And if that's the case, wasn't it error for the I.J. then to conclude that the inconsistency means there were no past persecution? It seems like – Go ahead. That was – I wouldn't say lazy, but the I.J. should have looked at each event and determined what was not consistent and then make the next conclusion, and that is to say that because of these various inconsistencies, the Petitioner can't demonstrate past persecution, but the I.J. didn't do that here. But the I.J. did determine that he wasn't – his testimony wasn't credible, and he wasn't eligible for withholding or removal. So implicit in that is the fact of the matter that he didn't establish past persecution. And the fact of the matter, the I.J., as we pointed out in our brief, the I.J. went through each analysis and talked about, in particular, the New Year's Eve event. And in his asylum application, he stated that he was slapped and beaten severely. That's on page 419 of the record, that he was beaten severely and hospitalized. In his testimony, which is on 159, he said he was hospitalized for depression. So you only need one in order to make an adverse credibility finding. But the immigration judge went through a slew of events, you know, going through each of his testimonies where there was this inconsistency either internally or with his application. So I hope I'm answering your question. Well, but it seems to me that in terms of the disfavored group analysis, the I.J., of course, didn't apply that analysis here. Right. It wasn't a claim brought before the immigration judge. But if it was a claim, and shouldn't the I.J. have, well, should we remand this case so that the I.J. go through that analysis? The answer would be no. It wasn't a claim brought before the immigration judge. It was brought before the board. But the board didn't see the reason to remand the immigration judge because it wouldn't change the end result. He failed to provide any individualized risk of persecution because he failed to provide any credible evidence. That really only deals with past persecution because we're just dealing with past persecution. So he's incredible for past persecution. That's right. He still gets a chance to do future persecution, correct? Right. Even if he doesn't have past, he doesn't get the presumption, but he still goes forward with the future persecution. So why not remand for that at least? Because you still don't, what evidence did he provide that was deemed to be credible, talking about his future persecution? His entire testimony was deemed to be incredible. So you have, he is forced, he's labeled to be, you know, have an adverse credibility finding determination, and it's supported by the record. So the fact of the matter is he didn't establish past persecution. He didn't establish a well-founded fear of future persecution. Remand is unnecessary because of that fact because you still, the analysis that's required is an individualized risk of persecution. He didn't establish that because all he talked about were these past events that occurred. So you don't need to remand for those cases. And there is no claim here that, I mean, there is a claim, or at least facts that some of his family remains in Indonesia and that they're able to go without persecution. That's right. And as the board mentioned that in his decision that some of the members remain there, and also he didn't explore internal relocation in Indonesia as well. So there was that analysis that occurred too. But ultimately there's no need to do that because part of that disfavored group analysis does involve that analysis of individualized risk. If Your Honor, I have no further questions. Do you have a question, Judge Gould? I have no question. Thank you. All right, thank you. Thank you. Do you want to give any rebuttal, Counselor? Quickly, as to the one-year issue, we did raise both the NCRS argument and the chained-circumstance argument. So we can raise both for this court. And plus, even if that weren't the case, the BIA sui sponte raised that issue. So that can be raised here. Secondly, once again, we do believe that he was credible, given the totality of circumstances. Like you said, dates, you know, 89-98. I'm sorry, 98. 2000, 2001. No, no, I mean Christmas. No, I mean New Year's. I mean, it's all within this time frame of like a couple weeks. And in being prompted, he did correct himself. Did you want to say anything about the alternative or, excuse me, the disfavored group analysis? Yes. At the time this case was heard, Tompou-Boulon didn't exist. I think the IJ believed that only Chinese applied to Chinese. This is a non-Chinese case, but a Christian case. Yes, it should be applied. We meant it for that reason. Because besides him being credible, I mean, no one ever discussed the – and even the Board of – If he weren't credible, then there really wouldn't be any evidence to put into the analysis, would there? If he were. If he were not. If he were not credible, that's tough. Yes, Judge, I agree. I mean, yes. Thank you very much for your argument. Thank you. This is Case 09-70582, Montelalu v. Holder.
judges: Du, Gould, Smith